In the Matter of Gerald G. **WOOD** and Ilse C. **Wood, d/b/a Wood and Sons Trucking Wood Farms,** Debtors.

**Bankruptcy No. MM11–82–02189.**

United States Bankruptcy Court, W.D. Wisconsin.

March 21, 1985.

---

Alasdair MacCormick, Madison, Wis., for Farm Loan Service, Inc.

Harry Loeb, Madison, Wis., for Loeb, Ching & Lagodney, S.C.

Robert Brill, Aulik & Brill, S.C., Sun Prairie, Wis., for Hanley Implement Co., Inc.

Jeffrey E. Schelble, Milwaukee, Wis., for Roman Laufenberg.

Rick M. Koeck, Marquardt, Carlson & Koeck, Ltd., Prairie du Soc, Wis., for Hartung Bros., Inc.

John Riley, Madison, Wis., for debtor.

## MEMORANDUM DECISION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

Gerald Wood, one of the debtors, has been operating under a confirmed chapter 11 plan since November 1983. Wood's operations originally included dairy farming and trucking. The dairying proved less profitable than hoped and on July 24, 1984, Wood scheduled an auction of his dairy herd and milking equipment to be conducted on August 27, 1984 by Farm Loan Service ("F.L.S."). F.L.S., on the assumption

that the auction had to be approved by the bankruptcy court, mailed all creditors in the bankruptcy case a notice of motion for sale. Thereafter on F.L.S.'s motion and in the absence of any objection an order was entered authorizing the auction sale.

On July 31, 1984, at 11:00 a.m., after the auction was arranged but before it was held, some of Wood's real estate was scheduled for a foreclosure sale. Early on the morning of July 31, Wood met with a friend, Roman Laufenberg, ("Laufenberg") who had been a dairy farmer and cattle dealer for seventy-two years. Wood agreed to "sell" Laufenberg his dairy herd for $42,000.00 so that Wood could use the cash to redeem his real estate. Laufenberg was aware of Wood's bankruptcy and the impending auction. Laufenberg agreed to leave the herd on Wood's farm and to have it sold in the auction without revealing his interest in the cows to anyone. Under the agreement Wood was to retain any amount more than $42,000.00 which the cows brought at auction and Wood was to pay Laufenberg any deficiency should the auction of the herd bring less than $42,000.00.

Pursuant to their agreement Laufenberg had his bank issue a cashier's check to Wood in the amount of $42,000.00. Wood and Laufenberg went together to the office of attorney John Riley to have him draw up a bill of sale. The check and bill of sale were exchanged, and the pair proceeded to the site of the foreclosure sale to attempt redemption. They were unsuccessful.

Thereafter Wood cashed Laufenberg's check and deposited the proceeds in his checking account. He made various payments from the account, mostly to creditors whose debts he thought were the most pressing. There was no apparent attempt to comply with the payment scheme described in Wood's chapter 11 plan. Approximately $4,000.00 to $5,000.00 remains in Wood's checking account.

After July 31 and prior to the auction the herd remained on Wood's farm. Laufenberg provided some assistance to Wood and his son who cared for and milked the animals after the hired help left. There was no effort to disclose the transfer of the cows, in fact Wood and Laufenberg agreed to hold the auction under Wood's name to avoid depressing the prices they would receive for the herd. Even at the hearing on F.L.S.'s motion to authorize the auction sale, Wood did not disclose to creditors' attorneys or Judge Frawley that the circumstances of the sale or the ownership of the cattle had changed.

After the auction Wood terminated his dairy operations. The auction brought in $42,862.50 which F.L.S. is holding to distribute in accordance with this decision. Claims against the funds include that of Hanley Implement Company, Inc. ("Hanley"), a creditor with a $2,250.00 security interest in three of the milk cows which were sold at the auction. Laufenberg now seeks payment of all the funds held by F.L.S. less any sums representing proceeds of Hanley's security interest.

The parties concede that the sale between Wood and Laufenberg was outside the ordinary course of business. Creditors claim that as such 11 U.S.C. § 363(b) requires notice and hearing in the bankruptcy court. That section provides, "[t]he trustee, after notice and a hearing, may ... sell ... other than in the ordinary course of business, property of the estate." Notice and an order from the court were obtained by F.L.S. for the sale of the cattle at auction but none was obtained for a private sale to Laufenberg.

■ Section 363 does not apply to either the auction or the private sale because Wood's chapter 11 plan was confirmed prior to these transactions. 11 U.S.C. § 1141(a) states, "the provisions of a confirmed plan bind the debtor ... any entity acquiring property under the plan, and any creditor...." Courts have applied section 363 to transactions in chapter 11 proceedings only where plans have not yet been confirmed. *See In Re Coastal Cable T.V., Inc.*, 24 B.R. 609, 9 B.C.D. 1096 (B.A.P. 1st Cir.1982). In those cases the issue has usually been whether a debtor could sell all or substantially all of the estate assets

under section 363, without conforming to chapter 11 requirements. The court in *In Re Ancor Exploration Co.*, 30 B.R. 802, 10 B.C.D. 1025 (N.D.Okla.1983) explained,

> The underlying issue is how 11 U.S.C. § 362(b) fits into the reorganization scheme of Chapter 11.
>
> . . . .
>
> ... Therefore, under the provisions of Chapter 11 it appears a sale of all or substantially all of the estate assets may be made, but only after disclosure, approval and confirmation. Section 363(b) ... would allow such a sale after notice and a hearing, thus conflicting with the procedural and substantive provisions of Chapter 11.
>
> Courts attempting to reconcile this apparent conflict have differed in their results.

30 B.R. at 806 (footnotes omitted). *See e.g., In Re White Motor Credit Corporation*, 14 B.R. 584, 590, 7 B.C.D. 885 (Bankr. N.D.Ohio 1981). ("It is clear, and the Court holds accordingly, that in a chapter 11 reorganization under the Bankruptcy Code, Section 363(b) does not authorize sale of all or substantially all assets of the estate.") The court in *In Re Whet Inc.*, 12 B.R. 743, 8 B.C.D. 379 (Bankr.D.Ma.1981), held that in a chapter 11 proceeding a sale of substantially all the estate assets other than in the usual course of business may be authorized under either section 363(b) or section 1123(b)(4) *prior* to plan approval. 12 B.R. at 750. *See also, In Re D.M. Christian Co.*, 7 B.R. 561, 7 B.C.D. 87 (Bankr.N.D.Va.1980) and *In Re Solar Mfg. Corp.*, 176 F.2d 493 (3rd Cir.1949).

■ Wood had transferable rights in the dairy herd after confirmation of his chapter 11 plan. The filing of his bankruptcy petition had the effect of divesting Wood of all legal or equitable interests he possessed in property at the time of the filing, 11 U.S.C. § 541(a)(1), including his right to transfer the property other than in the ordinary course of his business in the chapter 11 proceeding. *Commercial Credit, Etc. v. Northbrook Lumber Co., Inc.*, 22 B.R. 992 (N.D.Ill.1982). That status is adjusted again by the confirmation of a chapter 11 plan. Section 1141(b) states, "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." [1] The court in *U.S. v. Redmond*, 36 B.R. 932 (D.Kan.1984), explained,

> Unless a reorganization plan provides otherwise, confirmation vests all of the property of the estate in the debtor and releases it from all claims and interests of creditors. See 11 U.S.C. § 1141(b) & (c). The IRS, as well as other post-confirmation creditors of the reorganized debtor, are no longer restrained by the automatic stay in bankruptcy which terminates when the property of the estate vests in the reorganized debtor upon confirmation. See 11 U.S.C. § 362(e).

36 B.R. at 934. *See also In Re Central Watch, Inc.*, 22 B.R. 561, 9 B.C.D. 523 (Bankr.E.D.Wis.1982); *In Re Paradise Valley Country Club*, 26 B.R. 990, 10 B.C.D. 139 (Bankr.D.Colo.1983); *In Re American Properties, Inc.*, 30 B.R. 239 (Bankr.D.Kan.1983). Because Wood's plan was confirmed prior to the transaction with Laufenberg, Wood had rights in the dairy cattle which he could transfer to Laufenberg, subject only to provisions in the plan.

Wood's reorganization plan did not restrain Wood from selling his dairy herd. The only applicable provision in the plan is paragraph 11 which provides; "[d]ebtors reserve the right to sell or transfer, voluntarily, subject to court approval of price and terms, any real property, vehicles, or equipment, with liens to attach to net sale proceeds and the lienholders to be treated in the same manner as if the sale was a mandatory one under paragraph 10." Laufenberg contends that since the provision excludes livestock from the requirement of approval for sale Wood was free to sell his

---

**1.** So while a trustee may avoid certain transfers of property of the estate that occur after the commencement of a case under 11 U.S.C. § 549, once a chapter 11 plan is confirmed the property becomes property of the debtor under section 1141, and beyond the reach of the trustee under that section.

dairy herd without notice and court approval. Creditors argue that since the plan was to be funded by proceeds obtained through dairy farming and trucking, an implicit requirement of the plan was that Wood keep his dairy operation.

A large number of implicit provisions can be read into any plan. Section 1123 requires some degree of specificity in plans including providing adequate means for the plan's implementation. Creditors had the opportunity to protect their interests by the requirement of continued ownership of the cows under the plan when they voted upon whether to confirm it. At the time the plan was confirmed it was apparent that Wood's dairy operations were somewhat unstable, but no provisions were included in the plan to deal with his dairy herd. With the exercise of reasonable foresight, the creditors who negotiated with Wood could have sought the inclusion of provisions restraining the sale of the cows and any other necessary assets. At a minimum they could have insisted on the distribution of any proceeds from the sale of the cows.

Wood's creditors appear to be familiar with the mechanics of dairy farming and should be held to the explicit provisions of the plan for which they voted. Wood was left to manage his farm and other economic affairs under the plan, and had the right to sell any of his property which was not covered by paragraph 11 of the plan. There has been no proof or offer of proof that Wood's decision to hold the auction sale and to terminate dairying was not economically justified.

Determining that Wood had the authority to sell the cows does not dispose of this case. There remains a dispute as to whether a sale did in fact take place. The creditors quite properly argue that the transaction between Wood and Laufenberg was not a sale, but was rather a loan secured by a bill of sale to the herd given in lieu of any other form of security agreement. WIS STAT. § 402.106(1) provides, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Section 402.102 explains, "[u]nless the context

otherwise requires, this chapter applies to transactions and goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction." In *Consolidated Disc. Corp. v. Holton S.S. Bank,* 247 Wis. 152, 19 N.W.2d 171 (1945), the court held that a supposed sale was in reality a security transaction regardless of the sale contract, because the "buyer" gave no real consideration for money received. *See Barr v. Granahan,* 255 Wis. 192, 38 N.W.2d 705 (1948), *Smith v. Pfluger,* 126 Wis. 253, 105 N.W. 476, 476–77 (1905) ("[t]he mere form of an instrument cuts very little figure in respect to whether it is enforceable as a mortgage or not.... The purpose of the instrument is the controlling feature under all circumstances").

Various courts have defined the term sale as used in similar state provisions under the Uniform Commercial Code. "A sale is a contract between two parties called the seller and the buyer, by which the former in consideration of payment transfers to the latter the title and possession of property; and it constitutes transfer of goods for consideration," *American Container Corporation v. Hanley Trucking Corporation,* 111 N.J. 322, 268 A.2d 313 (1970). "A sale is a consensual transaction, and the subject matter which passes is to be determined by the intent of the parties as revealed by the terms of their agreement in light of the surrounding circumstances," *City of Everett v. Sumstad's Estate,* 95 Wash.2d 853, 631 P.2d 366 (1981). The intent of the parties is a question of fact for the trier. *Lebowitz v. McPike,* 151 Conn. 566, 201 A.2d 469 (1964).

■ The transaction between Wood and Laufenberg was not a sale for two reasons. First, there was no transfer of possession of the property. Wood retained possession of the cows until the auction. He received milk checks up to the auction, and paid his hired help to milk the cows when he and Laufenberg did not. The risk of loss remained with Wood under the agreement to settle the "purchase price" after the sale of

the cows and auction. Wood did in fact lose two of his cows prior to the auction and admitted to be responsible to Laufenberg to make up the deficiency caused thereby.

Second, there was no consideration for the $42,000.00 except the agreement to repay. Laufenberg knew of the auction that was to take place within weeks of the date he advanced the money to Wood, and he realized that Wood needed the money immediately to attempt to redeem his real property from foreclosure. Laufenberg anticipated the auction sale by transferring $42,000.00 to Wood and requiring that Wood give him any proceeds received from the auction sale up to $42,000.00, and by agreeing that Wood would be indebted to him for any deficiency under $42,000.00. Wood gave Laufenberg nothing except the right to receive the money back in a few weeks. Laufenberg specifically declined to receive any value received for the cows at auction in excess of the $42,000.00 he advanced to Wood on July 31, 1984. Laufenberg did not receive anything from Wood except the assurance that his $42,000.00 would be repaid. Under WIS.STAT. § 402.102, the transaction was intended to operate only as a security transaction.

As further support of the loan characterization creditors point out that Laufenberg is now attempting to get the money, not the cows, back. F.L.S.'s attorney also argues that instead of purchasing seven cows at the auction which he now claims that he already owned, Laufenberg would have known to "bid-in" the cows from his own herd which he wished to retain so as to avoid paying 8% sale commission.

The intent of Wood and Laufenberg, as revealed by the terms of their agreement and in light of the surrounding circumstances, was to allow Laufenberg to hold a bill of sale for $42,000.00 to assure that the loan in that amount would be repaid from the proceeds from the auction. Because the transaction was a loan, Laufenberg's claim is that of a creditor whose security interest arose under largely oral agreement. The only writing evidencing the agreement is the bill of sale, and that document while granting Laufenberg an interest in the property, fails to spell out other terms of the transaction.

WIS.STAT. § 409.203 provides that a security interest attaches when

(a) ... the debtor has signed a security agreement which contains a description of the collateral. ...

(b) Value has been given; and

(c) The debtor has rights in the collateral.

There is no doubt that Wood received value or that he had rights in the cows. Therefore, if the bill of sale is sufficient as a "security agreement" under section 409.-203(a), then Laufenberg had a security interest in the cows sold.

The court in, *In Re Don Miller, Inc.,* 35 B.R. 714 (Bankr.E.D.Wis.1984), explained, "Wisconsin has followed that line of cases lead [sic] by *American Card Co. v. H.M.H. Co.,* 97 R.I. 59, 63, 196 A.2d 150 (1963) which hold that a security agreement must be in writing and must contain appropriate language granting a security interest in specified property." 35 B.R. at 716. *See also Barth Brothers v. Billings,* 68 Wis.2d 80, 227 N.W.2d 673 (1975). In *Don Miller* a party purchased all of the common stock of the debtor and executed a promissory note to the seller which provided that it was secured by debtor's fixtures and equipment. The seller filed a financing statement with the Secretary of State covering the collateral. The court noted;

the stipulation and attached exhibits do not show that the debtor or anyone purporting to act in a corporate capacity signed the financing statement or any documents which granted [the seller] a security interest in the debtor's property nor do they show that the *debtor* or its agents agreed to grant [the seller] a security interest. That being so, § 409.-203, *WIS.STAT.,* precludes a finding that [the seller] has a security interest in the debtor's property.

35 B.R. at 717 (footnote omitted).

■ The Bill of Sale in the instant case was signed by Wood and contained words

which evidenced his intention to convey to Laufenberg Wood's interest in collateral specifically described as "48 milk cows and 40 heifers of all ages." *See National Acceptance Co. of America v. Doede,* 78 F.R.D. 333 (Wis.1978). While the language used purports to convey "all of seller's interest" in the dairy cows, it is clear from the surrounding circumstances that both parties intended only that a security interest be conveyed. Thus the bill of sale is sufficient under WIS.STAT. § 409.203 as a "security agreement" and Laufenberg holds a valid security in Wood's dairy cows. His security interest continued in the proceeds from the sale of the dairy cows at auction. WIS.STAT. § 409.306.

■ Since Laufenberg did not take possession of the dairy cows and did not file a financing statement covering the dairy cows, his security interest is unperfected under Wisconsin law. WIS.STAT. §§ 409.-302, 409.305. Having determined that Laufenberg had a security interest, despite the fact that that interest was unperfected, it remains to be determined whether that interest should be granted priority over the complaining creditors in the proceeds of the sale.

■ The creditors have asserted no bases upon which I can find that they are entitled to priority over Laufenberg's interest in the proceeds. Generally even an unperfected security interest is good against general creditors. WIS.STATS. §§ 409.201, 409.301. Once Wood's plan was confirmed, the cows were free and clear of all claims and interests of the creditors, except as otherwise provided in the plan. 11 U.S.C. § 1141(b), *see American Properties, supra,* and authorities cited therein. Wood's plan did not encumber the dairy cows or restrict Wood's right to use his dairy cows as security for loans.[2] None of the creditors [3] appearing in this

action have demonstrated that they have standing to invoke any powers granted under title 11 of the U.S. Code to avoid the interest of Laufenberg.[4] Thus, as unsecured creditors without rights under the plan or state law which prime the security interest of Laufenberg, the creditors are subordinate to even an unperfected security interest in the cows and Laufenberg is entitled to the proceeds from the sale of the dairy cows.

Upon the foregoing which constitute my findings of fact and conclusions of law in this contested matter, it is hereby

ORDERED that the proceeds of the auction shall be distributed as follows:

1.) costs of sale and commission to Farm Loan Service.

2.) proceeds of sale of cows identifiable to the Hanley Implement Company, Inc. security agreement to Hanley Implement Company, Inc.

3.) the remainder to Roman Laufenberg.

---

**2.** *See* analysis and accompanying footnote page 5, *supra.*

**3.** Parties do concur that Hanley has a security interest in certain of the dairy cows sold at the auction sale, for $2,250.00 which is prior to the claims of either Wood or Laufenberg.

**4.** Although it might be argued that Wood as a debtor in possession under a confirmed plan may have some residual power under 11 U.S.C. § 544(a) to avoid unperfected liens, Wood appears in this case to support the claim of Laufenberg.